## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **JO L. LAWSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **No. 05-2402-KHV** |
| | ) | |
| **JOHN POTTER, Postmaster General Of** | ) | |
| **United States Postal Service,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Jo L. Lawson filed suit against her employer, John E. Potter, Postmaster General of the United States Postal Service ("USPS"). Plaintiff alleges that the USPS discriminated because of sex and retaliated for protected activity, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* This matter is before the Court on the Motion Of Defendant For Summary Judgment (Doc. #40) filed September 19, 2006. For reasons stated below, the Court sustains defendant's motion.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id.

at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).   Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).   The nonmoving party may not rest on her pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment."   Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  Anderson, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

## Factual Background

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the

light most favorable to plaintiff, the non-movant.[1]

In 1994, the USPS hired plaintiff, a female, as a rural letter carrier associate. Plaintiff worked out of the post office in Ottawa, Kansas. For a short period beginning in 1998, plaintiff was a part-time flexible letter carrier, but she later became a full-time letter carrier. After August of 2001, plaintiff was a regular city carrier on a full-time, eight-hour per day bid position, five days per week. As a regular city carrier, plaintiff had to drive a USPS vehicle; sort mail into a carrier case in sequence of delivery, which involved holding two to three inches of letter mail in the left hand or three to six inches of flats on the left arm and sorting into the carrier case with the right hand (commonly called "casing" mail); sorting various other mail such as forwarded or misdirected mail; pulling mail out of the carrier case in sequence into bundles; delivering mail on foot or by vehicle; collecting outgoing mail; and maintaining pleasant and efficient public relations.

From 2001 through 2004, each letter carrier had a demonstrated record of past performance for office and street time, and each route was established to maintain a regular delivery schedule.[2] As of October 22, 2001, plaintiff's rate of sorting mail was 14.81 pieces per minute. On that day, however, she only sorted 8.78 pieces per minute.

From 2001 through 2004, management at the Ottawa post office determined each carrier's daily workload by a computer printout based in part on an automated count of each piece of mail, a manual count for any mail which could not be counted by machine and the carrier's demonstrated performance on the

---

[1]     The Court does not consider facts which the record does not support.

[2]     Plaintiff argues that management did not conduct "official route inspections" after 1994. Plaintiff has not explained how "official route inspections" differ from the record of performance used by management from 2001 through 2004.

particular route.[3]   In addition, Doug Combs, a supervisor in 2001, personally assessed each carrier's mail volume and routinely discussed workload with carriers before they left for their delivery routes.  The portion of a carrier's estimated daily workload over eights hours is considered "overtime."  The portion of a carrier's estimated daily workload under eight hours is considered "undertime."

From 2001 through 2004, the USPS had a five-minute overtime leeway policy.  If a full-time letter carrier completed his or her assigned route within five minutes of the allotted eight hours, any undertime or overtime was not reflected in the carrier's pay.  On occasion, the USPS assigned carriers a "pivot," i.e. additional mail to sort and/or deliver from another route.

USPS employees are subject to progressive discipline.  Management resolves many employee issues through job discussions.  The normal progression of formal discipline is a letter of warning, a seven-day suspension, a fourteen-day suspension, and finally, termination of employment.

From 2001 through 2004, the USPS viewed five to 15 minutes of overtime on a sporadic basis as insignificant for a full-time letter carrier.  The supervisor would generally have an unofficial job discussion with the letter carrier, rather than formal discipline, unless the carrier frequently used such overtime.

Janice M. Rake has served as Postmaster at the Ottawa post office since March 9, 2002.  Rake had been officer-in-charge in Ottawa from January 16, 2001 to January 8, 2002, while the Postmaster position was

---

[3]         The computer printout was generated by the delivery operation inspection system ("DOIS"). In her declaration, plaintiff states that the National Association of Letter Carriers ("NALC") union does not recognize DOIS and that it is not an effective tool for determining the time required for a carrier to complete a route.  See Plaintiff's Declaration ¶ 18.  Plaintiff does not explain how union recognition of DOIS is material to her claims.  Moreover, plaintiff has not explained the basis of her opinion that DOIS is ineffective.  In any event, plaintiff does not deny that management at the Ottawa post office used DOIS, along with several other tools, to measure the performance of all male and female letter carriers.

vacant.  The USPS employed Rake for more than 29 years and she has served more than 23 years in management.  As Postmaster, Rake is responsible for processing and maintaining personnel actions, attendance records, performance records, and accident and injury compensation records.  Relative to plaintiff, Rake was in a management supervisory position.  Plaintiff also reported to a direct supervisor: Doug Combs (before March of 2002); Robert Stabler (March, 2003 to October, 2004) and Richard Brown (since October 1, 2005).  At other periods of time after March of 2002, different individuals (including Todd McDermed, Carnell Green, Will McIntyre and Brown) served as plaintiff's acting supervisor.  Rake personally supervises activity on the work room floor and assumes personal responsibility for some disciplinary actions.  After Brown became a permanent supervisor, he was responsible for job discussions and interviews and Rake served as the reviewing official.

After August of 2001, plaintiff had the lowest overall performance of any letter carrier in the Ottawa post office.  Before any formal discipline, Rake, Green and Stabler had numerous discussions with plaintiff concerning unauthorized use of overtime and failure to perform to the level of her demonstrated performance standard.  From March 28, 2001 through June 21, 2003, managers met with plaintiff on at least 19 occasions in job discussions and pre-disciplinary meetings regarding her failure to follow instructions as shown by unacceptable conduct or unacceptable performance.

On October 22, 2001, plaintiff asked for assistance with her route.  Plaintiff's workload for that day showed 30 minutes of undertime.  Rake denied plaintiff's request because plaintiff's workload was light, but Rake instructed plaintiff to curtail bulk business mail.[4]  Plaintiff had approximately three feet of business mail

---

[4]      USPS policy permits curtailment of certain bulk mail, such as business mail, when necessary
(continued...)

that could have been curtailed, but she curtailed only .75 feet of mail and worked some 48 minutes of unauthorized overtime.  Plaintiff received overtime pay at the USPS overtime rate.  On November 8, 2001, Rake gave plaintiff a letter of warning because she had failed to follow Rake's instructions and worked unauthorized overtime on October 22, 2001.  Rake did not know any carrier except plaintiff who failed to curtail mail when she specifically instructed her to do so.

Beginning shortly before plaintiff became a full-time letter carrier in August of 2001, Combs saw a decline in plaintiff's performance regarding her time to sort mail and complete her route.[5]  Combs typically discussed performance deficiencies with letter carriers no more frequently than every few months.  Because plaintiff's unauthorized use of overtime occurred so frequently, however, he had informal job discussions with her every three to five days.  Despite these informal discussions, Combs observed no improvement in plaintiff's performance.

The USPS attendance policy in effect in December of 2001 required that for absences in excess of three days involving sick leave, (1) employees generally had to submit documentation of incapacity to work;

_____

[4](...continued)
to accomplish timely delivery of other mail, such as first-class mail, within the allotted eight hours.  This policy permits the USPS to pay carriers less overtime.

[5]      Plaintiff maintains that Combs did as Rake required, and that before Rake arrived, Combs did not officially discipline plaintiff.  See Plaintiff's Declaration ¶ 12.  Plaintiff's assertion that Combs did as Rake required does not create any inference of discrimination on the basis of gender.  Moreover, a change in management's evaluation of employee performance does not by itself raise an inference of pretext.  See Aquilino v. Univ. of Kan., 83 F. Supp.2d 1248, 1256 (D. Kan. 2000); Valdivia v. Univ. of Kan. Med. Ctr., 24 F. Supp.2d 1169, 1174 (D. Kan. 1998); see also Viola v. Philips Med. Sys. of N. Am., 42 F.3d 712, 717-18 (2d Cir. 1994) (rejecting inference of discrimination or pretext from negative performance review after prior positive reviews); Orisek v. Am. Inst. of Aeronautics & Astronautics, 938 F. Supp. 185, 188 (S.D.N.Y. 1996) (same), aff'd, 162 F.3d 1148, 1998 WL 650257 (2d Cir. 1998).

and (2) the employee's attending physician had to explain the nature of the illness or injury and furnish medical documentation sufficient to indicate that the employee was or would be unable to perform his or her normal duties for the period of absence and any specific work limitations. USPS management posted and reviewed this policy with all employees.

On December 1, 2001, Combs told plaintiff that he wanted to discuss her performance. Plaintiff said that she needed to leave to go to the doctor because her foot and hip were hurting and the injuries were a recurrence of a prior on-the-job injury. Combs gave plaintiff forms CA2 and CA 17 and told her to return them that day, along with a doctor certification, after she saw the doctor.[6] Plaintiff did not return the forms that day. Plaintiff's son later left at the post office a copy of a doctor's note which stated, "[o]ff work one week." Plaintiff's doctor also faxed an incomplete CA17 form without physician information. Plaintiff did not provide the original, fully completed CA forms as directed.

On December 3, 2001, plaintiff called Rake and said that her doctor had referred her to a podiatrist and that she was also going to another doctor for a shoulder problem. Rake asked plaintiff whether she had provided the CA forms, and plaintiff said that she had not done so. Rake told plaintiff that she had to submit the forms and that plaintiff could bring them the next day.

Combs saw plaintiff at the office on December 4, 2001. Plaintiff did not submit the completed CA forms, but Combs gave her new CA17 forms for upcoming doctors' visits. Plaintiff left the blank forms on Combs' desk. When plaintiff returned from her appointment that same day, she gave Combs a copy of her doctor's certificate. Combs gave the copy back to plaintiff and instructed her to give him the original and the

---

[6]   When an employee claims that a medical condition is caused by an on-the-job injury, the USPS Office of Injury Compensation requires the employee to submit original "CA forms."

CA forms.  Combs requested the original because the Office of Injury Compensation required it.  Plaintiff, however, did not provide the original certificate or the CA forms.

On December 6, 2001, plaintiff tried to give Combs a copy of the doctor's certificate for her appointment that day.  Combs again told plaintiff to provide the original certificate, the original certificate from her prior appointment and completed CA forms.  Plaintiff refused to do so.  Later that day, Rake told plaintiff to give Combs the original certificates from her appointments on December 4 and 6.  Plaintiff refused to do so.  Rake told plaintiff that management had the right to request the information contained in the forms and that her refusal to provide information constituted failure to follow instructions.  Plaintiff demanded that Rake provide a written explanation of the information requested.[7]  Plaintiff accused Rake of refusing to let her see her personnel file, even though Rake had allowed her to do so on October 30, 2001 (with the limitation that plaintiff could not see managers' personal notes).  Plaintiff also accused Rake of failing to note on a street observation form that plaintiff had stopped to exercise her shoulder.  In fact, Rake had made a notation about plaintiff exercising her shoulder, and had provided a copy of it to plaintiff, and she viewed plaintiff's allegation as false.

Rake considered plaintiff's false accusations and demeanor on December 6, 2001 to be insubordinate, discourteous and unprofessional.  Accordingly, on January 7, 2002, Rake gave plaintiff a seven-day suspension.  Rake noted that plaintiff had failed to follow repeated instructions about doctor certifications and on December 6, 2001, demonstrated unacceptable conduct toward her.  Rake gave plaintiff a seven-day suspension because she had previously received a letter of warning.  The seven-day suspension was the next successive level in the progressive discipline process.  Plaintiff served the suspension at work and did not lose

---

[7]     Rake provided this information in a letter dated December 7, 2001.

pay.

On October 8, 2002, Rake instructed plaintiff that she could not continue to tape record conversations on the workroom floor and that such conduct violated policy. On December 16, 2002, both Rake and Green, the acting supervisor, saw plaintiff operating a tape recorder on the workroom floor. That day, both supervisors repeatedly instructed plaintiff to turn off the tape recorder and remove it. Plaintiff refused to do so. After a union steward asked plaintiff to turn off the recorder, plaintiff did so but did not remove it from the workroom floor. Plaintiff does not deny that she had a tape recorder at work to record conversation. In Rake's experience at Ottawa, no employee except plaintiff attempted to tape record conversations on the workroom floor.

Later on December 16, 2002, plaintiff stopped work at least four times to engage Green in conversation despite Green's continued instruction to plaintiff not to do so. After Green repeatedly told plaintiff to return to work, plaintiff left her work station and walked toward Rake's office. Green told plaintiff to return to work, but plaintiff ignored him and walked away. On January 13, 2003, Rake suspended plaintiff for 14 days for failure to follow instructions on December 16, 2002. Plaintiff had already received a letter of warning and a seven-day suspension, and the suspension was the next successive level in the USPS progressive discipline process. Plaintiff served the suspension at work and did not lose pay.

On November 12, 2002, plaintiff received a document which notified employees that requests for copies of documents must be made by the union steward. On January 17, 2003, Rake saw plaintiff make an unauthorized copy of a schedule on the USPS copier. The schedule which plaintiff copied was her standard work schedule. On January 29, 2003, Rake suspended plaintiff for 14 days for making an unauthorized copy. The notice of suspension stated that "THIS IS YOUR FINAL NOTICE PRIOR TO DISCHARGE." Plaintiff

served the suspension at work and did not lose pay.  Rake elected to suspend plaintiff, rather than terminate her employment under the progressive discipline policy, to give her another opportunity.

On July 1, 2003, the Postal Union's National Business Agent told Rake that any union steward could represent plaintiff at a pre-disciplinary interview.  Rake reported this information to Stabler, the acting supervisor, who told plaintiff to report with the union steward for a pre-disciplinary interview.  Plaintiff refused and stated that she wanted a particular steward who was not at work that week.  Stabler told plaintiff that the union agent had explained that any union steward could represent her.  Plaintiff refused to attend.  Stabler again told plaintiff to report for the interview, but in a very loud voice in the presence of other employees and customers, plaintiff refused to do so.  Stabler considered plaintiff's conduct to be disrespectful, unprofessional and insubordinate.  Plaintiff does not deny that she was loud and confrontational with Stabler that day.

On July 5, 2003, plaintiff's route showed undertime of approximately 87 minutes, and she received a pivot of 46 minutes.  Stabler instructed plaintiff to curtail sufficient mail to complete her work within eight hours.  Plaintiff failed to do so and in addition to the lost undertime, worked 23 minutes of unauthorized overtime.

On July 9, 2003, plaintiff's route showed undertime of 21 minutes.  Stabler instructed plaintiff to curtail sufficient mail to complete her work within eight hours.  Plaintiff failed to do so and in addition to the lost undertime, worked 17 minutes of unauthorized overtime.

On July 14, 2003, after plaintiff received credit to deliver previously curtailed mail, her route showed undertime of 36 minutes.  Stabler instructed plaintiff to curtail mail, but plaintiff did not do so.  In addition to the lost undertime, plaintiff worked 23 minutes of unauthorized overtime.  Plaintiff did not request authorization of overtime as required by USPS standard operating procedure.

On July 21, 2003, after plaintiff received credit to deliver previously curtailed mail, her route showed

10

undertime of 68 minutes.  In addition to loss of the undertime, plaintiff worked 14 minutes of unauthorized overtime.  Plaintiff did not timely submit a request for overtime.

On July 25, 2003, because plaintiff's route showed undertime of 73 minutes, she received a pivot of 65 minutes.  Plaintiff did not curtail mail and worked 67 minutes of unauthorized overtime.

On July 28, 2003, after plaintiff received credit to deliver previously curtailed mail, her route showed overtime of three minutes.  Plaintiff did not curtail mail and worked 77 minutes of unauthorized overtime.

On July 31, 2003, Rake gave plaintiff a notice of removal for unacceptable conduct and failure to follow Stabler's instructions on July 1, 2003; failure to follow Stabler's instructions and unacceptable performance on July 5, 9, 14, 21 and 25, 2003; and failure to follow Brown's instructions and unacceptable performance on July 21, 2003.[8]  Plaintiff filed a grievance and on February 24, 2004, an arbitrator reinstated her without

---

[8]     The Court has excluded plaintiff's general conclusions as to Rake's treatment of her and the veracity of statements by Rake and other supervisors.  For example, in her declaration, plaintiff states as follows:

> Janice Rake began a campaign of abuse and harassment against myself and Tandy Ross, both middle aged women and NALC [National Association of Letter Carriers] union officials, immediately on her arrival as officer in charge (OIC) in January 2001.  * * *
> Janice Rake and her group of sycophantic supervisors are making uncorroborated self serving assertions here, which I intend to challenge in court.  I know that they are not truth tellers from my personal experience with the entire group.

Plaintiff's Declaration ¶¶ 13, 23.  Rule 56, Fed. R. Civ. P., requires that plaintiff set forth specific facts showing a genuine issue for trial.  Plaintiff cannot satisfy this standard by her conclusory opinion that Rake harassed her and another female employee.  See Fitzgerald v. Corr. Corp. of Am., 403 F.3d 1134, 1143 (10th Cir. 2005) (conclusory allegations without specific supporting facts have no probative value); Fanslow v. Chicago Mfg. Ctr., Inc., 384 F.3d 469, 483 (7th Cir. 2004) (plaintiff cannot defeat summary judgment by submitting self-serving affidavit that contains bald assertion of general truth of particular matter, but must cite "specific concrete facts" establishing existence of truth of matter asserted).  Plaintiff's declaration suggests multiple reasons why Rake acted as she did including plaintiff's age, gender and union affiliation.  Absent specific

(continued...)

back pay or benefits.  The arbitrator noted as follows:

> Based on Grievant's negative performance record dating back to her prior Postmaster, her recent history of suspensions, and the escalation of her sub-par performance under the current Postmaster, as sympathetic as I may be to Management's claim that Grievant had exhausted all of her lives as of July 25, 2003, if not July 24, it is guilty of giving Grievant false hope.  When Management excused overtime she should not have worked, when it continually failed to adequately address June and post-July 1 performance failures, and when it failed to promptly respond and adequately discipline Grievant for her deplorable July 1 behavior, Grievant would not have reasonably been on notice that her next violation would be her last.  Without such notice and with the number of flaws in the Employer's case against Grievant, the Service did not sustain its burden of proving just cause for discharge.
>
> I am compelled to return Grievant to work, but because I am satisfied her removal was justifiable and would have been sustained if properly administered, I cannot award Grievant back pay.

See Arbitration Decision Dated February 24, 2004, attached as Exhibit 4 to Defendant's Reply.

Before October 22, 2004, Brown had instructed letter carriers to ensure that their USPS vehicles were locked when they returned to the facility.  On October 22, 2004, Brown checked all USPS vehicles to make sure that they were locked and contained no mail.  Brown reported that the passenger side door of plaintiff's vehicle was unlocked.  Plaintiff believes that she did not leave the door unlocked, but when Brown questioned her that day, she told him that the door had been sticking.  Brown attempted to open the door and had no problem doing so.  Brown later determined that plaintiff had never submitted a request to repair the sticking door.

On November 8, 2004, plaintiff's route showed 22 minutes of undertime.  Rake offered plaintiff a

---

[8](...continued)

supporting facts for plaintiff's opinion, no reasonable jury could conclude that gender was a motivating factor in Rake's discipline of plaintiff.  In addition, plaintiff cannot overcome a motion for summary judgment by simply stating that Rake and other supervisors are liars without specific facts on which a reasonable jury could draw such a conclusion.  See Fitzgerald, 403 F.3d at 1143.

choice of pivots, but plaintiff said she did not have time to do a pivot.  Later that day, Rake saw plaintiff curtailing mail and informed her that she should not need to do so.  In response, plaintiff slumped over and plodded back to her station, professing to be demonstrating her observation of other carriers.  On November 8, 2004, Rake saw plaintiff sorting only small handfuls of mail, approximately one-half to one inch each, significantly less than the normal armful of flat mail of at least three inches for sorting purposes.  Rake saw plaintiff engage in other time-wasting practices, such as stopping sorting to endorse a letter and pulling down only one cell at a time.[9]  Plaintiff's pivot that day was ultimately re-assigned to another carrier, causing some 20 minutes of unnecessary overtime.

To maintain efficiency, the USPS designates authorized "park points" at which carriers stop their vehicles.  On November 15, 2004, Brown saw plaintiff park at unauthorized points, deliver mail out of sequence, load her vehicle in a disorganized manner, make excessive trips to the vehicle, and make inefficient load adjustments.  Plaintiff used 53 minutes of unauthorized overtime that day.

On November 16, 2004, Rake saw plaintiff staring at her and asked plaintiff whether she needed anything.  Plaintiff walked off the workroom floor without responding.  Later that same day, Rake saw plaintiff pulling down only one cell at a time even though her mail volume did not justify doing so.

_____

[9]      Cells are separations of mail within the mail case.  Normal procedure for USPS carriers is to simultaneously retrieve as many cells as possible, which promotes efficiency.  Only in the event of unusually bulky mail or parcels should a carrier retrieve only one cell at a time.  Rake instructed plaintiff to pull more than one cell at a time to increase productivity.  On November 8, 2004, plaintiff's mail was not so bulky as to justify pulling down only one cell at a time.

Although plaintiff's brief does not cite her declaration on the issue, plaintiff's declaration states, without referring to a specific date or incident, that "I deny the assertion that I pulled mail one cell at a time."  Plaintiff's Declaration ¶ 21.  Even if the Court assumes that plaintiff's declaration refers to the November 8, 2004 incident, plaintiff does not specifically deny that Rake saw her engage in other time-wasting practices that day.

On November 17, 2004, Brown conducted a pre-disciplinary interview with plaintiff about her poor delivery performance. When Brown questioned plaintiff, plaintiff refused to answer verbally; she simply wrote "I work to the best of my ability" and showed it to Brown. Brown asked plaintiff to respond verbally, but she refused to do so.

On November 20, 2004, Brown gave plaintiff a notice of termination, which included three charges: (1) leaving a postal vehicle unsecured on October 22, 2004; (2) unacceptable conduct toward a supervisor on November 17, 2004; and (3) unacceptable performance on November 8, 15 and 16, 2004. In issuing the notice, Brown considered the nature, facts and circumstances of the conduct at issue, plaintiff's past record of disciplinary conduct and the USPS progressive discipline policy.

Plaintiff filed a grievance under the collective bargaining agreement, contending that defendant had terminated her employment without just cause. On May 19, 2005, an arbitrator ordered plaintiff reinstated without back pay or benefits. The arbitrator noted as follows:

> [The February 24, 2004 arbitration] award provides fair warning that the grievant had reached the final step in the disciplinary progression. [The February 24, 2004 arbitration] award cannot be accurately described as being equivalent to a "last chance settlement." There was no element of agreement from the Union or grievant which binds this grievant to standards other than the Article 16 just cause standards for any further disciplinary infractions.
>
> Charge 2, Unacceptable Conduct is left without a simple preponderance of evidence in support of the allegation and is therefore without merit. Charge 1, Left postal Vehicle Unsecured, is supported by a simple preponderance of evidence, even though there are plausible alternative explanations for the vehicle being found unsecured and the fact that management's changing of vehicle security policies and treatment of a defective window are suspect. The grievant's culpability in this matter is proven, but it does not rise to a level warranting a progression in disciplinary penalty alone. Charge 3 Unacceptable Performance does not rise to a level that warrants discharge. . . . The November 8 and November 15 incidents are minor deficiencies which oblige some managerial attempt to resolve these issues short of applying discipline. For several minor incidents to be allowed to accumulate without corrective intervention short of discipline, is contrary, in this Arbitrator's considered opinion,

of the "corrective, not punitive" requirements for discipline of Article 16 Section 1 of the parties' 2001 National Agreement.

<u>See</u> Arbitration Decision Dated May 19, 2005, attached as Exhibit 5 to <u>Defendant's Reply</u> (Doc. #44).

After becoming Postmaster at Ottawa, Rake adjusted office performance standards for letter carriers on only two occasions. On both occasions, in an attempt to improve plaintiff's consistency in performance, Rake adjusted the standards in plaintiff's favor. No supervisor has ever heard Rake mention or refer to plaintiff's gender or equal employment opportunity ("EEO") activity in any way.

Except for one occasion on February 1 or 2, 2004, when plaintiff attended a meeting and was not paid, the USPS paid plaintiff at the overtime rate on every occasion that she worked overtime, including unauthorized overtime.

Plaintiff filed an EEO complaint of sex discrimination and retaliation as to her notice of termination on July 31, 2003 and the discipline leading up to the notice. On June 16, 2004, after a hearing before an administrative law judge, the USPS EEO Division concluded that plaintiff had not established her allegations of sex discrimination and retaliation. On September 15, 2004, plaintiff filed suit against the Postmaster General of the USPS. Plaintiff alleges that by the letter of warning on November 8, 2001, the seven-day suspension on January 7, 2002, the suspensions for 14 days on January 12 and 29, 2003, and the notice of termination on July 31, 2003, the USPS discriminated against her because of gender. Plaintiff also alleges that by the notice of termination on November 20, 2004, the USPS discriminated and retaliated against her for gender and protected activity, in violation of Title VII.

When Brown issued plaintiff the notice of termination on November 20, 2004, Rake and Brown did

not know that she had filed this lawsuit on September 15, 2004.[10]

## Analysis

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The Court applies a disparate treatment analysis to claims alleging that an employer treats some people less favorably than others because of their race, color, religion, sex or national origin.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  To prevail on her disparate treatment claim under Title VII, plaintiff must show that the alleged discrimination was intentional.

Because she relies upon indirect evidence, plaintiff's claims of sex discrimination are subject to the familiar three-step McDonnell Douglas analytical framework.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225-1226 (10th Cir. 2000) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  Under McDonnell Douglas, plaintiff has the initial burden of showing a prima facie case of sex discrimination.  Kendrick, 220 F.3d at 1226.  Plaintiff satisfies this burden by presenting a scenario which on its face suggests that defendant more likely than not discriminated against her.  See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  As to each claim of disparate treatment, plaintiff may make a prima facie case by showing that (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the adverse employment action occurred under circumstances which give rise to an inference of

---

[10]      Though not directly relevant to plaintiff's claims in this case, the USPS again terminated plaintiff's employment on March 28, 2006.  On September 28, 2006, an arbitrator once again ordered plaintiff reinstated without back pay or benefits.

discrimination.  Hysten v. Burlington N. & Santa Fe Ry. Co., 296 F.3d 1177, 1181 (10th Cir. 2002)).  The

burden of establishing a prima facie case of disparate treatment is not onerous.  For purposes of summary

judgment, defendant concedes that plaintiff has established a prima facie case.  The burden thus shifts to

defendant to articulate a legitimate, nondiscriminatory reason for the questioned action.  See Nulf v. Int'l Paper

Co., 656 F.2d 553, 558 (10th Cir. 1981).

Defendant has cited violations of employment policies and practices as reasons for the various

disciplinary actions and termination of plaintiff's employment on two occasions.[11]  Defendant has met its burden

to articulate facially nondiscriminatory reasons for each adverse employment action.  See Kendrick, 220 F.3d

at 1229-1230.

Under the third step of the McDonnell Douglas framework, the burden shifts back to plaintiff to show

that defendant's stated reasons for discipline and termination are merely a pretext to hide sexual discrimination.

Id. at 1230; Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir. 1995).  Defendant asserts that it is entitled

to summary judgment because plaintiff has produced no evidence from which a jury could conclude that the

real reason for discipline or termination was gender.  The relevant issue is not whether the stated reasons for

termination were wise, fair or correct but whether defendant honestly believed in those reasons and acted in

---

[11]      In particular, defendant states that the various disciplinary actions were based on (1) plaintiff's failure to follow instructions, which resulted in unauthorized use of overtime; (2) plaintiff's refusal to provide original medical documentation when specifically instructed to do so; (3) plaintiff's demonstration of discourteous, unprofessional and insubordinate behavior; (4) plaintiff's possession of a tape recorder on the workroom floor for the purpose of recording conversation; (5) plaintiff's making an unauthorized photocopy; (6) plaintiff's unacceptable conduct, failure to follow Stabler's instructions and unauthorized overtime on several occasions; and (7) plaintiff's leaving a postal vehicle unsecured, refusal to respond verbally to a supervisor about her performance, unauthorized overtime, and pulling down only one cell of mail at a time even though her mail volume did not justify doing so.

good faith.  Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004).  In examining this issue, a court must

"look at the facts as they appear to the person making the decision to terminate plaintiff."  Kendrick, 220 F.3d

at 1231.  The Court's role is not to second guess an employer's business judgment.  Stover, 382 F.3d at 1076.

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable

fact finder could rationally find them unworthy of credence."  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th

Cir. 1997) (quotations omitted).  While "[t]his burden is not onerous . . . it is also not empty or perfunctory."

Id. at 1323-24.  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that

defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence

that defendant acted contrary to a written company policy prescribing the action to be taken under the

circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company

practice when making the adverse employment decision affecting plaintiff.  Kendrick, 220 F.3d at 1230.  More

specifically, evidence of pretext may include, but is not limited to, the following: "prior treatment of plaintiff; the

employer's policy and practice regarding minority employment (including statistical data); disturbing procedural

irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria."  Simms v. Okla.

ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir.), cert. denied, 528

U.S. 815 (1999).

Plaintiff first asserts that she has shown pretext because on three separate occasions, an arbitrator

reinstated her and found that defendant's stated reasons were unworthy of belief.  On September 28, 2006,

based on plaintiff's grievance under the collective bargaining agreement, an arbitrator ordered that plaintiff be

reinstated.  In addition, on two prior occasions, an arbitrator ruled in favor of plaintiff under the collective

bargaining agreement.  Plaintiff, however, has not shown how the arbitration decisions establish that defendant's stated reasons are unworthy of belief or a pretext for sex discrimination.  The arbitrators decided whether the USPS had just cause under the collective bargaining agreement to terminate plaintiff's employment.  The Court substantially agrees with the reasoning of the Honorable Richard D. Rogers on the relevance of such arbitration decisions.  In another case in the context of age and disability discrimination claims, Judge Rogers commented as follows:

> Plaintiff asserts that the Postal Service has not shown just cause for removing plaintiff or offered good grounds to vacate the arbitrator's decision which led to his reinstatement as a letter carrier.  However, it is not the burden of the Postal Service to prove it had just cause for removing plaintiff.  Nor does the arbitrator's decision control plaintiff's claims of disability and age discrimination.  Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974).  The arbitrator held that good cause to remove plaintiff had not been established for the purposes of the collective bargaining agreement.  There was no holding that plaintiff's removal or suspension was motivated by plaintiff's disability or age.

> Nor should the arbitrator's decision be considered convincing proof of pretext in this case.  The arbitrator decided that the Postal Service's proof was not adequate to demonstrate good cause for removing plaintiff as an employee.  He clearly did not suggest that the Postal Service disbelieved the adequacy its case or that the Postal Service's reasoning was a subterfuge for a discriminatory intent.  In other words, while there may be cause to find the nondiscriminatory reasons for removal inadequate for that purpose, there are no rational grounds for inferring that the Postal Service acted on the basis of plaintiff's age or disability.  The employer's perception of plaintiff's conduct is what is important.  See Furr v. Seagate Technology, Inc., 82 F.3d 980, 988 (10th Cir. 1996) cert. denied, 519 U.S. 1056 (1997).  A reasonable jury examining the arbitrator's decision would not find that the Postal Service used the allegations in the Notice of Removal as a pretext for age or disability discrimination.

Luttrell v. U.S. Postal Serv., No. 96-4087-RDR, 2000 WL 1279486, at *7 (D. Kan. Aug. 15, 2000) (discussing age and disability claims).

Plaintiff has offered meager evidence regarding the specific personnel actions at issue.  Below, the Court evaluates whether a reasonable jury could find that defendant's stated reason for each personnel action

is a pretext for gender discrimination or – as to the notice of termination on November 20, 2004 – a pretext for retaliation.

      1.    <u>Letter Of Warning On November 8, 2001</u>

      Defendant asserts that it gave plaintiff a letter of warning on November 8, 2001 because on October 22, 2001, she had failed to follow instructions and caused unauthorized use of overtime.  Plaintiff first argues that defendant's stated reason is false because on that day, when she worked 48 minutes of unauthorized overtime, Jim Ferris, a male full-time letter carrier, worked 12½ minutes of unauthorized overtime and defendant did not discipline him.  In support, plaintiff refers to a document titled "Clockring Detail Report For 10/22/01," which reflects that plaintiff worked 8.80 hours with "OT not authorized" and that Ferris worked 8.21 hours with "OT authorized."  <u>See</u> Attachment 5 to <u>Plaintiff's Response</u> (Doc. #43).  Plaintiff ignores the fact that the overtime by Ferris was authorized and that in any event, management viewed sporadic use of overtime (between five and 15 minutes) to be insignificant.

      Plaintiff next maintains that on seven other occasions Ferris worked unauthorized overtime without discipline.  In support, plaintiff has produced computer print-outs which reflect that Ferris worked overtime that was "not authorized."  The documents, however, do not reflect whether management had actually authorized overtime but failed to note that fact in the computer system or whether the overtime was insignificant.  <u>See</u> Attachment 1 to <u>Plaintiff's Response</u> (Doc. #43).  Indeed, in a supplemental declaration, Rake states that (1) management often fails to timely enter the overtime authorization code, so overtime may appear to be unauthorized when it is actually authorized; and (2) she reviewed each instance where Ferris worked overtime and found that management had either (a) authorized the overtime in advance but failed to timely enter the authorization code, (b) retroactively authorized the overtime based on discussion with Ferris and review of his

daily workload, or (c) determined that the use of overtime was sporadic and insignificant (less than 15 minutes).

See Supplemental Declaration Of Janice M. Rake ¶ 11, Attachment 1 to Defendant's Reply (Doc. #44).  In

addition, plaintiff was disciplined for "failure to follow instructions, *resulting* in unauthorized overtime."  See

Exhibit 1 to Rake Declaration, Attachment 1 to Defendant's Memorandum (Doc. #41) (emphasis added).[12]

Plaintiff has not shown that Ferris used overtime because of failure to follow instructions.[13]  In sum, plaintiff's

computer print-outs would not lead a reasonable jury to find that defendant's stated reason for plaintiff's letter

of warning is unworthy of credence.

      2.      Suspension For Seven Days On January 7, 2002

      Defendant asserts that it gave plaintiff a seven-day suspension because she refused to provide original

medical documentation when Rake and Combs specifically instructed her to do so, and exhibited discourteous,

unprofessional and insubordinate behavior in a conversation with Rake on December 6, 2001.  Plaintiff first

argues that a national agreement between the Postal Union and the USPS overruled the local USPS policy

---

    [12]     Plaintiff's declaration states that "[w]hen men worked unauthorized overtime, Janice Rake as a matter of course, retroactively authorized any overtime incurred by male letter carriers and did not issue discipline as she did with Tandy Ross and me."  Plaintiff's Declaration ¶ 10.  Plaintiff has not specified the amount of overtime used by male letter carriers or whether such overtime resulted from a failure to follow a supervisor's instructions.  The Court therefore finds that plaintiff's statement does not create a genuine issue of fact as to pretext.

    [13]     Plaintiff has produced computer print-outs which reflect that two other male employees worked overtime that was "not authorized."  See Attachments 2 and 3 to Plaintiff's Response (Doc. #43).  These documents suffer the same deficiencies as those submitted in connection with overtime by Ferris.  In particular, Rake reviewed all of the instances of overtime by these two employees and concluded that management had either (a) authorized the overtime in advance but did not timely enter the authorization code, (b) retroactively authorized the overtime based on discussion with the employee and review of his daily workload, or (c) determined that the use of overtime was sporadic and insignificant (less than 15 minutes).  See Supplemental Declaration Of Janice M. Rake ¶ 11, Attachment 1 to Defendant's Reply (Doc. #44).  In addition, one of the employees, Richard Brown, was a supervisor during part of the relevant time.  See id.  Finally, plaintiff has not shown that Brown and the other employee used overtime because of failure to follow instructions.

which required original medical documentation.  Plaintiff provides no evidence in support of her position.

Plaintiff argues that she supplied a letter from Dr. Ransom, but she does not explain how Dr. Ransom's letter

is material.  Plaintiff does not dispute that the Office of Injury Compensation requires *original* medical forms

and that she did not provide the required originals, as directed by her supervisors.[14]   In addition, plaintiff

concedes that Rake considered her behavior on December 6, 2001 to be discourteous, unprofessional and

insubordinate.  Plaintiff's disagreement with USPS policy on medical documentation would not cause a

reasonable jury to find that defendant's stated reason for plaintiff's seven-day suspension on January 7, 2002

is a pretext for gender discrimination.

### 3.   Suspension For 14 Days On January 13, 2003

Defendant asserts that it suspended plaintiff for 14 days on January 13, 2003 because she had a tape

recorder on the workroom floor for the purpose of recording conversation.  Plaintiff does not dispute any of

the underlying facts regrading this suspension.  She concedes that she refused to turn off her tape recorder and

remove it from the workroom floor after Rake and Green repeatedly told her that she could not tape record

conversations on the workroom floor and that such conduct violated policy.  Plaintiff does not deny that she

had a tape recorder at work for the purpose of taping conversations.  Plaintiff has offered no evidence which

suggests that defendant's stated reason for the suspension on January 12, 2003 is a pretext for gender

---

[14]        Plaintiff's declaration states that the local USPS policy of requiring originals was an example of the "harassment and demeaning 'jumping through hoops' required by Ms. Rake regarding every aspect of my employment experience" and "representative of [a] policy of petty but traumatic harassment by Janice Rake and her supervisors."  Plaintiff's Declaration ¶¶ 14-15.  Plaintiff offers no evidence that Rake or other supervisors selectively enforced the medical documentation policy against women in general or plaintiff in particular.  Plaintiff's statements therefore would not cause a reasonable jury to find that defendant's stated reason for her suspension on January 7, 2002 is unworthy of credence.

discrimination.[15]

    4.        <u>Suspension For 14 Days On January 29, 2003</u>

Defendant asserts that on January 29, 2003, it gave plaintiff a second suspension for 14 days because she made an unauthorized photocopy on January 17, 2003.  Plaintiff concedes that under the progressive discipline policy, Rake could have terminated her employment for this conduct, but Rake chose to give her another opportunity to correct her behavior.  Plaintiff apparently maintains that defendant's stated reason is unworthy of credence because Combs had previously instructed her to make her own copy of the schedule and she had always done so.  Plaintiff admits, however, that on November 12, 2002, she received a document which stated that any requests for copies must be made by the union steward.  Plaintiff has presented no evidence that she made copies of her schedule without discipline after she received the notice or that anyone authorized her to make her own copies.  In addition, plaintiff has not shown that Rake knew that anyone had authorized her to make a copy of her schedule.  Plaintiff's evidence does not support an inference of pretext.[16]

---

[15]    Plaintiff's declaration states that (1) clerks had double cassette recorders on the workroom floor and (2) another letter carrier had a cassette player/recorder on the workroom floor.  <u>See</u> Plaintiff's Declaration ¶ 16.  Plaintiff concedes that she does not know whether these player/recorders were used to record conversation.  The USPS did not prohibit employees from playing music on the workroom floor.  Also, plaintiff has not specified the time of these incidents or whether Rake knew about them.

[16]    The Court notes that a 14-day suspension for one unauthorized photocopy might seem severe.  Particularly in light of plaintiff's previous discipline, however, the Court cannot second-guess defendant's evaluation of the significance of plaintiff's violation of company policy.  <u>See</u> <u>Bullington v. United Air Lines, Inc.</u>, 186 F.3d 1301, 1318 (10th Cir. 1999) (relevant inquiry not whether employer's reasons wise, fair or correct, but whether employer honestly believed those reasons and acted in good faith upon those beliefs).  Moreover, the suspension was not particularly punitive since plaintiff was allowed to serve it at work and suffered no loss of pay and the suspension was not the next step under the progressive discipline policy.  Therefore, even though defendant did not raise the issue, the Court questions whether the "suspension" on January 29, 2003 even constitutes an adverse employment action.

Plaintiff also maintains that defendant's stated reason is pretextual because on the day she made the unauthorized copy, Brown had his diesel truck plugged into postal electricity with the electrical cord strung across the parking lot. Plaintiff offers no evidence that Rake knew of Brown's conduct, that Brown had been previously advised not to engage in such conduct, or that Brown had a history of not following supervisory instructions. The fact that another employee at the Ottawa post office may have violated some other (unstated) policy does not suggest that defendant's stated reason for plaintiff's suspension on January 29, 2003 is unworthy of credence.

5.     Notice Of Termination On July 31, 2003

Defendant asserts that it terminated plaintiff's employment on July 31, 2003 because (1) she engaged in unacceptable conduct and did not follow Stabler's instructions on July 1, 2003; (2) she did not follow Stabler's instructions and had unacceptable performance on July 5, 9, 14, 21 and 25, 2003; and (3) she did not Brown's instructions and had unacceptable performance on July 21, 2003.

Because defendant has offered multiple non-discriminatory reasons for its action, plaintiff generally must proffer evidence to show that each of defendant's justifications are pretextual. See Tyler v. RE/MAX Mtn. States, Inc., 232 F.3d 808, 814 (10th Cir. 2000). The Tenth Circuit recognizes, however, that "when the plaintiff casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility." Id. In such circumstances, the jury need not believe the employer's remaining reasons. See id. An employee is relieved of the obligation of proving that each stated reason is pretextual only where "the multiple grounds offered by the defendant . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff may [prevail]." Id. (quoting Wilson v. AM Gen. Corp., 167 F.3d 1114, 1120 (7th Cir. 1999)) (further citation omitted).

Initially, plaintiff admits that she did not follow instructions and was loud and confrontational with Stabler on July 1, 2003. Defendant's first stated reason therefore is not pretextual. Plaintiff argues that defendant's other stated reasons are unworthy of credence because the NALC union does not recognize the DOIS measurement tool for determining the time required for a carrier to complete a route and – in her opinion – the DOIS tool was not effective. Plaintiff, however, offers no evidence that USPS management did not recognize the DOIS measurement tool or applied it differently to male and female letter carriers. Accordingly, plaintiff's evidence is insufficient to cause a reasonable jury to find that defendant's stated reasons for the termination of her employment on July 31, 2003 are unworthy of credence.

6.    Notice of Termination On November 20, 2004

Plaintiff claims that defendant terminated her employment on November 20, 2004 because of gender and/or because she had filed this lawsuit alleging sex discrimination. Defendant asserts that it terminated plaintiff's employment because (1) on October 22, 2004, plaintiff left a postal vehicle unsecured; (2) on November 17, 2004, plaintiff refused to respond verbally to Brown, a supervisor, about her performance; (3) on November 8 and 15, 2004, plaintiff worked unauthorized overtime; and (4) on November 16, 2004, plaintiff pulled down only one cell of mail at a time even though her mail volume did not justify doing so.

Plaintiff maintains that she did not leave the postal vehicle door unlocked on October 22, 2004. Without referring to a specific date, vehicle or door, plaintiff's declaration states that "[m]y vehicle door was not left unlocked." Plaintiff's Declaration ¶ 19. Even if the Court assumes that plaintiff's affidavit refers to October 22, 2004 and the passenger door of her postal vehicle, plaintiff has not shown that she informed Brown or anyone else that she had not left the door unlocked. Plaintiff concedes that on October 22, 2004, when Brown asked her about the door being unlocked, she said that the passenger door had been sticking.

Plaintiff does not claim that she told Brown that she did not leave the door unlocked.  Plaintiff also concedes that after she explained to Brown that the passenger door had been sticking, Brown (1) inspected the vehicle and had no problem opening the door and (2) verified that plaintiff had not submitted a repair request for the door.  Particularly in light of plaintiff's contemporaneous explanation to Brown, plaintiff's general denial that she left the door unlocked does not contradict Brown's statement that he discovered the door unlocked.  In sum, no reasonable jury could find that defendant's first stated reason is unworthy of credence.[17]

As to defendant's second and third stated reasons for terminating plaintiff's employment, i.e. failure to verbally respond to Brown about her performance and unauthorized use of overtime and poor performance, plaintiff states generally that Rake had a vendetta against middle aged women who are union officials such as plaintiff and Ross and constantly gave plaintiff unmerited harassment.  See Plaintiff's Declaration ¶ 13.  As explained above, Rule 56, Fed. R. Civ. P., requires that plaintiff set forth specific facts showing a genuine issue for trial.  Plaintiff cannot satisfy this standard by her conclusory opinion that Rake had a vendetta against her and Ross.  See Fitzgerald, 403 F.3d at 1143 (conclusory allegations without specific supporting facts have no probative value); Fanslow, 384 F.3d at 483 (plaintiff cannot defeat summary judgment by submitting self-serving affidavit that contains bald assertion of general truth of particular matter, but must cite "specific concrete facts" establishing existence of truth of matter asserted).  Plaintiff has not provided specific facts – such as the total number of male and female employees at the Ottawa post office, the specific "unmerited

---

[17]     Even if the Court found in favor of plaintiff on this issue, plaintiff at most has shown that one of defendant's stated reasons may be false.  Because defendant's stated reasons for terminating plaintiff's employment are not significantly intertwined and the potential pretextual character of defendant's explanation related to the postal vehicle being unlocked is not particularly fishy and suspicious, no reasonable jury could find from this incident that all of defendant's stated reasons for the termination of plaintiff's employment on November 20, 2004 are a pretext for gender discrimination.  See Tyler, 232 F.3d at 814.

harassment" against plaintiff and Ross or whether Rake and other supervisors gave other employees such harassment – which are necessary for a jury to draw any inference from Rake's treatment of plaintiff and Ross. See Fitzgerald, 403 F.3d at 1143.  Plaintiff's conclusory opinion of the underlying reasons for Rake's conduct is unsupported.  Moreover, plaintiff does not deny that she failed to verbally respond to Brown about her performance, that she used unauthorized overtime and that her performance was poor under the standards employed by management for all letter carriers.

Based on this record, no reasonable jury could find that defendant's stated reasons for terminating plaintiff's employment on November 20, 2004 are a pretext for gender discrimination or retaliation. Accordingly, the Court sustains defendant's motion for summary judgment on these claims.

**IT IS THEREFORE ORDERED** that the Motion Of Defendant For Summary Judgment (Doc. #40) filed September 19, 2006 be and hereby is **SUSTAINED**.

Dated this 4th day of December, 2006 at Kansas City, Kansas.

s/  Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

27